UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**CHARLES WILLIAMS**                                   **CIVIL ACTION**

**VERSUS**                                             **NO: 23-07012**

**ALLIED TRUST INSURANCE COMPANY**                     **SECTION: "H"**

**ORDER AND REASONS**

Before the Court is Defendant Allied Trust Insurance Company's Motion to Enforce Settlement Agreement (Rec. Doc. 9). For the reasons set forth herein, the Motion is **GRANTED.**

**BACKGROUND**

This matter arises from damages to Plaintiff Charles Williams' property located at 5 Windsor St., LaPlace, LA 70068 allegedly caused by Hurricane Ida.[1] Defendant Allied Trust Insurance Company issued a homeowner's policy to Charles Williams as the name insured for the Property for a policy period of August 1, 2021 to August 1, 2022 (the "Policy").[2] On August 23, 2023, Plaintiff filed a Petition for Damages in the 40th Judicial District Court for St. John the Baptist Parish.[3] Plaintiff alleges claims based on Defendant's breach of the

---

[1] Rec. Doc. 9-1 at 1.
[2] *Id.*
[3] Rec. Doc. 1-1 at 3.

1

Policy as well as "bad faith claims adjusting."[4] On November 21, 2023, Defendant filed its Notice of Removal with this Court.[5]

Plaintiff contends that shortly after Hurricane Ida, he reported his property damage claim to Defendant.[6] The Property was inspected on at least two occasions, and interim payments were made.[7]  In early 2023, Morgan Glasgow, the claims adjustor, contacted Plaintiff to negotiate settlement.[8]

According to Plaintiff, on April 7, 2023, the following estimates were sent to Defendant for work that still needed to be completed:

Air Frey Range: $1,524.16

HVAC: $14,740.80

Windows: $6,109.48.[9]

Plaintiff alleges that in July 2023, Defendant called and offered $22,500 to settle the claim. In response, Plaintiff made a counteroffer of $30,000, which was rejected.[10] On July 6, 2023, Plaintiff texted Defendant's claims adjuster, Morgan Glasgow, "25800 offer let's close today."[11] On July 7, 2023, Ms. Glasgow responded "I will accept 25,8000 in exchange for an executed global

---

[4] *Id.* at 8–11.

[5] Rec. Doc. 1.

[6] Rec. Doc. 12 at 2.

[7] Defendant avers that invoices provided by Plaintiff total $ 82,664.59, and that it has paid $105,839.81 under Coverage A.

[8] Plaintiff's policy lists email address and phone number, this is how the Defendant communicated with Plaintiff.

[9] Rec. Doc. 12-1 at 2.

[10] *Id.*

[11] Rec. Doc. 9-6 at 1. Confusingly, Plaintiff contends that on July 7, 2023, he became "frustrated because he had not had a properly working HVAC system" which is why he stated "let's close today" on July 6, 2023. Rec. Doc. 12-1 at 2. Based on the record, it appears that the text message was sent on July 6, 2023.

2

release. I will draft the release and submit it for approval."[12] Ms. Glasgow submitted the release documents on that same day, and followed with several text messages to Plaintiff inquiring about the status of the release.[13] On July 10, 2023, Ms. Glasgow also sent an email instructing Plaintiff to review the release, and advised Plaintiff to sign if he was in agreeance.[14]

On August 10, 2023, Plaintiff responded via text message that he tried signing the form but that he was unable to do so on his computer.[15] That same day, Ms. Glasgow advised that the form would need to be printed, to which Plaintiff responded "ok."[16] Ms. Glasgow sent two additional text messages following up on the status of the release.[17] Plaintiff has not, to date, executed the global release.[18]

On September 21, 2023, Defendant issued a check to Plaintiff in the amount of $ 25,800.[19] The check notes that it was a "Final Payment."[20] Plaintiff has not yet cashed the check.[21]

On September 4, 2024, Defendant filed the instance Motion to Enforce Settlement Agreement, contending that despite allegedly agreeing to the

---

[12] *Id.*
[13] *Id.* at 2–4.
[14] Rec. Doc. 12 at 21.
[15] *Id.* at 3.
[16] *Id.*
[17] *Id.* at 4.
[18] Rec. Doc. 12 at 4.
[19] Rec. Doc. 9-6 at 4.
[20] Rec. Doc. 12-1 at 20.
[21] Rec. Doc. 12 at 5.

settlement amount, Plaintiff "has filed suit and is now demanding an amount which greatly exceeds the agreed-to settlement amount."[22] Plaintiff opposes.[23]

## LEGAL STANDARD

### 1. Motion to Enforce Settlement and Motion for Summary Judgment

"A district court may summarily enforce a settlement agreement if no material facts are in dispute . . . ."[24] "When the opposition to enforcement of the settlement is based not on the merits of the claim but on a challenge to the validity of the agreement itself, the parties must be allowed an evidentiary hearing on disputed issues of the validity and scope of the agreement."[25] As to the difference between a motion for summary judgment and motion to enforce a settlement agreement, the Fifth Circuit has explained that

> [t]his central issue—whether there was any disputed issue of material fact as to the validity of the settlement agreement[ ]—is similar to that which any court must address when ruling on a motion for summary judgment. This is not mere coincidence. The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in the litigation.[26]

Additionally, a contested motion to enforce a settlement agreement differs from a motion to summary judgment in that the former, if denied due

---

[22] Rec. Doc. 9 at 2.
[23] Rec. Doc. 12.
[24] *In re* Deepwater Horizon, 786 F.3d 344, 354 (5th Cir. 2015).
[25] *Id.*
[26] *Id.* (quoting Tiernan v. Devoe, 923 F.2d 1024, 1031 (3d Cir. 1991)).

to a disputed issued of material fact, results in an evidentiary hearing.[27] The latter would instead result in "a trial on the merits if the non-movant identified a genuine issue of material fact."[28]

### 2. Law on Compromise

In diversity cases, "federal courts must apply state substantive law."[29] "In determining which state's substantive law controls, the court applies the choice-of-law rules of the forum state."[30] Here, the parties agree that Louisiana law, including Louisiana Civil Code article 3071, applies to the instant action.[31] Louisiana Civil Code article 3071 provides that a "compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." [32] Louisiana courts have further explained that a compromise "is agreement to adjust differences of two or more persons by mutual consent for preventing or ending lawsuit."[33] In turn, Louisiana Civil Code article 3072 provides that "a compromise shall be made in writing or recited in open court . . . ." "A compromise is valid if there is a meeting of the minds of the parties as to exactly what they intended when the compromise was reached . . . . Indeed,

---

[27] *Id.*

[28] *Id.* at 367 n.12.

[29] *In re* Katrina Canal Breaches Litig., 495 F.3d 191, 206 (5th Cir. 2007) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

[30] *Id.* (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 469 (1941)).

[31] Rec. Doc. 12 at 3; *see also* Banque De Depots v. Bozel Mineracao E Ferroligas, 98-0742, p.11 (La. App. 4 Cir. 1/27/99), 728 So.2d 533, 538.

[32] Moreover, "[t]o find that the parties reached a binding compromise where the terms of defendants' release from liability are unknown would be contrary to" Louisiana Civil Code article 3071. Townsend v. Square, 94-0758, p. 7 (La. App. 4 Cir. 9/29/94); 643 So.2d 787, 790.

[33] Brasseaux v. Allstate Ins. Co., 1997-0526, p.4 (La. App. 1 Cir. 1998); 710 So.2d 826, 828.

a compromise is a contract."[34] Thus, a binding settlement agreement "requires consent of the parties, established through offer and acceptance, and a meeting of the minds."[35] Additionally, an offer that is different from the original offer is a counteroffer.[36] "An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer."[37]

"A compromise instrument constitutes the law between the parties and must be interpreted in accordance with the intent of the parties."[38] "A compromise instrument is governed by the same general rules of construction applicable to contracts," which provides that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[39] Further, "a compromise extends only to those matters the parties intended to settle and the scope of the transaction cannot be extended by implication."[40] "Courts apply this rule of construction in light of the general principle that the instrument must be considered as a whole and in light of attending events and circumstances."[41]

---

[34] Feingerts v. State Farm Mut. Auto Ins. Co., 12-1598, p.12 (La. App. 4 Cir. 6/26/13), 117 So.3d 1294, 1301 (quoting Elder v. Elder & Elder Enters., Ltd., 06-0703, p.6 (La. App. 4 Cir. 1/11/07), 948 So.2d 348, 350–51).

[35] Landix v. Blunt, 12-1231, p.5 (La. App. 4 Cir. 3/20/13), 112 So.3d 376, 379.

[36] Henry v. Howard L. Nations, A.P.C., No. 23-30467, 2024 WL 3673539, at *4 (5th Cir. Aug. 6, 2024).

[37] *Id.* (quoting LA CIV. CODE ART. 1943).

[38] Trahan v. Coca Cola Bottling Co. United, 04-0100, p.15 (La. 3/2/05), 894 So.2d 1096, 1107.

[39] *Id.* (citing LA. CIV. CODE art. 2046).

[40] *Id.* (citing LA CIV. CODE art. 3073).

[41] *Id.*

6

"The meaning and intent of the parties to a compromise is ordinarily determined from the four corners of the instrument, and extrinsic evidence is inadmissible to explain or to contradict the terms of the instrument."[42] Moreover, "[w]hen a dispute occurs regarding the scope of a compromise, extrinsic evidence can be considered to determine exactly what differences the parties intended to settle."[43] "Absent some substantiating evidence of mistaken intent," however, "no reason exists to look beyond the four corners of the instrument to ascertain the parties' intent."[44]

## **LAW AND ARGUMENT**

Defendant contends that Plaintiff's July 2023 text message stating "25800 offer let's close today," and Defendant's response that it "would accept 25,800 in exchange for an executed global release" constitute a meeting of the minds and that the parties clearly agreed on a release in exchange for $25,8000.[45] Plaintiff responds that there was no meeting of the minds because he would not have agreed to that amount, as it was "much less of the amount of money needed than the remaining amount of work on" the Property.[46] Plaintiff contends that he was not represented by counsel when he was contacting Ms. Glasgow, that he has never signed the release, and that he has not cashed the check issued to him marked "final payment."[47] Finally, Plaintiff points out that even assuming an agreement was reached, Defendant owes

---

[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] Rec. Doc. 9-1 at 5.
[46] Rec. Doc. 12 at 4.
[47] Rec. Doc. 12-1.

7

penalties under Louisiana Revised Statutes § 22:1892 and/or § 22:1973 due to its failure to timely tender the settlement amount.[48]

Plaintiff's primary argument is that there was no meeting of the minds because he never signed the agreement.[49] To determine whether there is a valid compromise, the Court looks to whether there was an offer and acceptance via "sufficient writings signed by both parties."[50] "Emails can qualify as the signed writings needed to form contracts."[51] Although Louisiana Civil Code article 3071 "requires a written contract signed by both parties, the agreement need not be contained in one document."[52] Relevant here, where there is a clear meeting of the minds, "a Plaintiff's refusal to sign release papers is immaterial to the issue of whether an agreement that was reached."[53]

As this Court has explained, if

> the intent of the parties was to be bound first and then reduce the contract to a formal writing, then the contemplation of the written agreement does not foreclose the earlier existence of a contract. If the writing was a perquisite to a binding contract, then the

---

[48] These statutes were restructured and amended effective July 1, 2024. *See* S.B. 323, 2024 Leg., Reg. Sess. (La. 2024).

[49] Plaintiff also contends both that he assumed he was settling only his HVAC claims and that that he did not understand the implications of any purported agreement because he was not represented by counsel. Nothing in the record suggests that Plaintiff did not understand the nature of the communication, and Plaintiff admits that he was advised to secure counsel. As such, Plaintiff's suggestion that the settlement is invalid because he failed to secure counsel is without merit. *See* Smith v. Millenium Galvanizing, LLC, 22-433, p.7–8, (La. App. 5 Cir. 3/29/23), 361 So.3d 57, 63.

[50] Preston Law Firm, L.L.C. v. Mariner Health Care Mgmt. Co., 622 F.3d 384, 391 (5th Cir. 2010).

[51] *Id.*

[52] *Townsend*, 643 So.2d at 790.

[53] Deep S. Equipment Co. v. Jones Motor Grp., No. 18-2164, 2019 WL 302840, at *3 (E.D. La. Jan. 3, 2019) (citing Morris, Lee & Bayle, LLC v. Macquet, 14-1080, (La. App. 4 Cir. 3/23/16), 192 So.3d 198.

8

requirement of a writing is a suspensive condition, which prevents enforcement of the agreement until that condition is satisfied.[54]

And, "a settlement agreement may be binding even if it is subject to later formalities that do not occur."[55]

Here, Plaintiff states that he was first contacted by Defendant via its claims adjuster to discuss making an offer over the phone.[56] After Plaintiff texted Defendant "25800 let's close today," Defendant, through its claims adjuster, responded that it would accept $25,8000 in exchange for a global release.[57] Plaintiff's statement, which occurred during settlement negotiations, constitutes an offer to settle his claims in exchange for $25,800 and clearly indicates his intent to be bound. Ms. Glasgow's response, in which she references a "global release," constitutes an acceptance of that offer. But even if Defendant's response constituted a counteroffer, rather than an acceptance, Plaintiff appeared to accept the offer when he texted Defendant over a month later, or August 10, 2023, that he tried signing the form.[58] These emails, when "read together," provide "direct evidence of [Plaintiff]'s acquiescence" to the release.[59]

---

[54] Burlington Ins. Co. v. Houston Cas. Co., 22-981, 2023 WL 2375361, at *7 (E.D. La. March 6, 2023). *Cf.* LA. CIV. CODE art. 1767 (explaining that a "conditional obligation is one dependent on an uncertain event" and that if "the obligation may not be enforced until the uncertain event occurs, the condition is suspensive").

[55] *Admins. of the Tulane Educ. Fund*, 2011 WL 692045, at *4.

[56] Rec. Doc. 12-1 at 2.

[57] Rec. Doc. 9-6 at 1 (emphasis added). The parties do not dispute the authenticity of these text messages.

[58] Rec. Doc. 12-1 at 9.

[59] *Preston*, 622 F.3d at 391.

The Court finds Plaintiff's argument that he never actually signed the release without merit. As courts in this circuit have explained, "[t]hat Plaintiff did not negotiate the settlement check or sign the release of liability has no bearing on whether an actual written settlement agreement was formed."[60] Indeed, the United States Court of Appeals for the Fifth Circuit, as well as this Court, have found on numerous occasions that emails or other correspondence may constitute a valid compromise.[61] Further, "even where the parties have not yet agreed to the precise terms and language of the release, they may nonetheless form a binding settlement agreement by agreeing to both the existence of a release and the amount of payment."[62] And while Plaintiff contends that he had reservations about settling, "reservations about the commitment" do "not alter the showing of consent and mutual concessions."[63] As such, the Court finds that the settlement satisfied the requirements of Louisiana Civil Code article 3071.[64]

Plaintiff further argues that he believed that his offer was for the HVAC system only. According to Plaintiff, he was first contacted by Ms. Glasgow via telephone to discuss making an offer "without disclosing the legal implications of what this means," and that, when Ms. Glasgow asked him what he thought "is a good number," Plaintiff thought Ms. Glasgow was referring to the

---

[60] Drawhorn-Davis v. State Farm Mut. Auto. Ins. Co., No. 19-496, 2020 WL 1430489, at *7 (M.D. La. Mar. 9, 2020).
[61] *Id.* (collecting cases).
[62] *Id.* (internal citations removed).
[63] *Id.* (quoting Klebanoff v. Haberle, 978 So.2d 598, 604 (5th Cir. 2008).
[64] *See* Elder v. Elder & Elder Enters., Ltd., 2006-0703 (La. App. 4 Cir. 1/11/07), 948 So.2d 348, 350-351 (noting that the requirements of Louisiana Civil Code article 3071 were satisfied in that "both parties worked together to reach an agreement to resolve a dispute that was in litigation").

10

windows on the HVAC on the Property."[65] He contends that Ms. Glasgow offered $22,500 for this amount, and that she rejected his counteroffer of $30,000.[66] Plaintiff contends that he stated "let's close today" because he was frustrated with the HVAC repair process and needed funds to repair it.[67]

Even considering Plaintiff's arguments, which rely primarily on extrinsic parole evidence, there is no indication that Plaintiff only intended to settle his HVAC claims.[68] The emails upon which Plaintiff relies merely discuss a May 2023 HVAC inspection and subsequent June 2023 report. As stated above, Plaintiff indicated that he intended to sign the global release, which clearly did not limit the settled claims to the amount of the HVAC repairs. Moreover, Defendants point out that the payments issued to Plaintiff "exceeded the current repair costs" and that the $25,800 payment "exceeded the HVAC bid." As such, there is no "substantiating evidence of mistaken intent," such that a "reason exists to look beyond the four corners of the instrument to ascertain the parties' intent."[69] Accordingly, the Court finds that the parties reached a compromise.

---

[65] *Id.* at 2.

[66] *Id.*

[67] *Id.*

[68] Again, "[w]hen a dispute arises as to the scope of a compromise agreement, extrinsic evidence can be considered to determine exactly what differences the parties intended to settle." Henry v. Howard L. Nations, A.P.C., No. 23-30467, 2024 WL 3673539, at *4 (5th Cir. Aug. 6, 2024) (quoting Anthony v. Liberty Mut. Ins. Co., 99-1730 (La. App. 3 Cir. 4/5/00), 759 So.2d 910, 914. 759 However, "[p]arol evidence should not be allowed to prove the existence of a settlement agreement. Parol evidence would only be relevant to prove what the parties intended to be covered by the agreement, or the scope of the settlement." *Id.* (quoting Collins v. Mike Trucking Co., 05-0238 (La. App. 1 Cir.), 934 So. 2d 827, 833. Here, Plaintiff does not appear to contest the scope of the agreement but rather contends that no agreement was reached.

[69] *Id.*

11

Finally, Plaintiff, in his opposition, argues that even if this Court finds that a settlement was reached, Defendant failed to timely tender the settlement funds because the settlement check was issued to Plaintiff on September 12, 2023—67 days after July 7, 2023, or the date the settlement was possibly perfected.[70] Plaintiff avers that as a result, Defendant owes penalties under Louisiana's bad faith statutes. This argument, however, is not before the Court. As such, this Court does not consider it.

## CONCLUSION

For the foregoing reasons, the Motion to Enforce Settlement Agreement is **GRANTED.**

New Orleans, Louisiana this 29th day of April, 2025.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[70] Plaintiff alleges that the settlement would have been perfected on July 6, 2023; however, Defendant did not respond until the following day. Rec. Doc. 12 at 4.